PERTH AMBOY GAS LIGHT COMPANY

*v.*

THE MIDDLESEX COUNTY BANK.

[Submitted February 1st, 1900.   Decided February 17th, 1900.
Filed November 17th, 1900.]

1. The general rule prevails in courts of equity that equality is equity.

2. The contract arising between a bank of deposit and an ordinary depositor is one for the loan of money, and not of bailment.

3. Where one deposits in a bank a check or draft on a third party, it is a bailment, unless the understanding be that he may at once draw against the deposit, or being indebted to the bank, that the deposit may be applied on such indebtedness.

4. Where the relation of loaner and borrower exists between a bank and its depositor, he may reclaim his deposit, as against the general creditors of the bank, in case of insolvency, when its officers received the deposit knowing the insolvency at the time, and were guilty of actual fraud in receiving it, and he is able to trace his deposit to the assets which came into the hands of the receiver or assignee, though he need not identify the very coin or bills deposited.

5. The fact that a cashier of a bank, who had abstracted funds therefrom, knew the bank was insolvent, is not notice of such insolvency to the other officers.

6. Where the cashier of a bank failed to appear during business hours, and a shortage in the cash was discovered by the president, and the cashier, who for years had the perfect confidence of the bank, telephoned that the balance was in another compartment of the vault, the president was not chargeable with notice of the bank's insolvency, and hence was not guilty of fraud in subsequently receiving deposits.

7. Where a president of a bank heard that its cashier had made unauthorized drafts on another bank, and appropriated the proceeds, to an amount exceeding the capital and surplus of the bank, and proposed to a bank examiner to close the bank, but was advised by him to first verify his information, and while this was being done with all possible speed the bank remained open, for one hour, the president was not guilty of fraud in receiving deposits during that period.

8. Where one deposits in a bank the check of another depositor of the bank, and is given credit therefor, the assets of the bank are not thereby increased, and hence there can be no tracing and reclaiming of the deposit on the insolvency of the bank.

Perth Amboy Gas Light Co. *v.* Middlesex County Bank.

On appeal from the decision of the receiver of the insolvent defendant.

This matter comes before the court on divers appeals from the rulings of the receiver refusing the demand of several creditors of the insolvent defendant bank to have their claims paid in full in preference to the general creditors. At the same time application is made to the court by several creditors, who have heretofore proved their claims as such and been admitted, to amend their claims so as to ask for a preferential payment. The general ground upon which the claim is made is that the claims in question arose shortly before the bank failed and after its insolvent condition was either actually known, or, under the circumstances, ought to have been known, by the officers of the bank.

The claims actually dealt with by the receiver are somewhat variant in their character. Some are based upon actual cash deposited shortly before the closing of the bank. Others are based on deposits of checks on other banking institutions similarly deposited. Others, and those greatest in amount, are by banks which sent to the insolvent bank for collection and remittance checks on the insolvent bank drawn by depositors therein; and, in a few instances, of checks drawn on other banks enclosed to the insolvent bank for collection.

As to this last class of items, they were forwarded by the insolvent bank to the bank upon which they were drawn and placed to the insolvent's credit by those banks, and, to the extent of the balance due to the insolvent bank from those correspondent banks upon which the checks were drawn, the receiver has recognized the claim as just, and has, or will, pay the same in full.

The undisputed facts of the case are that the insolvent bank was systematically robbed by its cashier for several years, the extent of the thefts increasing toward the last, so that for several months before it closed its doors (which occurred on the 14th of July, 1899) it was actually insolvent; but such insolvency was not known by any officers of the bank except the cashier.

The theft was accomplished by the following contrivance: The insolvent bank was located at Perth Amboy and kept its account in New York with the Park Bank, and in the regular course of business had, or should have had, a large balance to its credit in that bank; and for the purpose of drawing upon that balance kept a book of checks or drafts, with stubs, for the purpose of the entry on the stub or margin of the amount of drafts drawn, and the names of the persons in whose favor they were drawn. The cashier would draw a draft to himself for, say, $10,000, and enter upon the margin a small sum of, say, $20 or $30, and insert as the payee some firm in New York, who, supposedly, had drawn a draft upon some trader in Perth Amboy, and sent it to that bank for collection; the bank had collected it and remitted the proceeds in a draft on New York, the Park Bank being credited by the bookkeeper of the insolvent bank with the amount upon the stub, but it would be charged by the Park Bank with the true amount drawn. In this way the cashier succeeded in abstracting at least $110,000, so that on the day before the failure, while the books of the insolvent bank showed a balance of about $80,000 to its credit with the Park Bank, in New York, the books of the latter bank showed an overdraft of about $30,000. This difference of $110,000, together with some other bad debts, was more than enough to absorb the whole capital and surplus—$50,000 each—$100,000 in all—and leave it hopelessly insolvent.

Monthly balance sheets, or, as they were called, reconcilement sheets, were sent by the Park Bank to the insolvent bank, together with the vouchers for the current month; and these were kept in the bank where any of the officers or directors could have examined them; but, in point of fact, nobody did examine them, the whole of that work being left to the cashier. No examination was made by the president or directors, nor any committee, of this monthly account current, or any inquiry made of the Park Bank as to how the account stood on its books, until the day before the bank closed its doors.

A savings bank was conducted in the same banking-room with the insolvent bank, and the officers of the savings bank

and those of the insolvent bank, called the county bank, were the same, that is, Mr. Valentine, the cashier of the county bank, was also treasurer of the savings bank; Mr. U. B. Watson, the president of the insolvent bank, was secretary of the savings bank. They used the same vault, but had separate compartments assigned to each, as well as separate parts of the desk-room in the banking-room.

The insolvent bank had been regularly examined by the state bank examiner from year to year, and the attention of the president called to certain irregularities in the management of the cashier, which were corrected, in part only, by the officers of the bank. Notwithstanding these irregularities, which were serious in their character, the officers of the bank continued to have unbounded confidence in their cashier.

On Saturday evening, July 8th, 1899, at the close of the business of the savings bank, it had about $15,000 in cash on hand, which should have been placed by the treasurer, Mr. Valentine, in a particular drawer in the inner safe of the fire-proof vault. On Monday morning, July 10th, the cashier, who lived at Asbury Park, distant nearly an hour by rail, did not appear. The secretary, Mr. Watson (president of the county bank), opened the vault and took out the package which was supposed to contain $15,000, and opening it found it $7,900 short. About that time he was called up over the telephone by Mr. Valentine from New York, and told by him that he was detained and would be at the bank later in the day. Mr. Watson mentioned the shortage to Mr. Valentine, and asked him what it meant, and received for answer that the missing $7,900 was placed in his (Valentine's) private drawer in the vault, giving as a reason that the drawer of the savings bank was not large enough to hold the package of money. Mr. Watson was satisfied for the moment with this explanation, and expected Mr. Valentine to make his appearance as promised. He did not appear, nor did he appear the next day.

There was an informal meeting the next morning—Tuesday, the 11th—of a portion of the directors of the county bank, who were also a portion of the directors of the savings bank: and some time during the morning Mr. Watson mentioned to one

of them this shortage in the savings bank funds, and it was suggested to him that if Mr. Valentine did not come in shortly he should break open his drawer and get the money out. Mr. Watson did nothing, however, during that day. But on Wednesday morning, July 12th, he succeeded in finding a key which opened Mr. Valentine's drawer, and did open it, and found that there was no money there. He immediately wrote to the state banking commissioner, at Trenton, stating that the cashier had not appeared since Saturday night, and asking him to institute an examination of the two institutions. The commissioner of banking sent two men to the bank on the morning of Thursday, the 13th. They arrived there a little before twelve o'clock. Before they arrived, however, Mr. Convery, one of the directors of both institutions, a resident of Perth Amboy, came into the bank to make a deposit, and Mr. Watson informed him of the situation, and asked him to go to New York and ascertain, first, whether the negotiable securities—railroad bonds and the like—to a large amount, of the savings bank, which were kept in a safety deposit box in New York, were there or not; and second, to inquire of the Park Bank as to the balance due the county bank. This last was the result of a question by Mr. Convery as to whether or not the county bank was all right, and Mr. Watson said he thought it was, as they had a large balance to their credit in New York. Before Mr. Convery, however, left for New York, the bank examiners arrived, and approved of his mission.

Mr. Convery proceeded to New York, with a note from the president to the cashier of the Park Bank, called there—whether before or after he had looked after the bonds of the savings bank does not appear—and learned from him that the account of the county bank was overdrawn $30,000. As soon as he could he reached a telephone, and communicated the result to Mr. Watson. The information reached him about two o'clock, and was at once communicated to the bank examiners. If that information was correct, Mr. Watson was aware that the bank was insolvent, as the difference between the balances of the two banks was $110,000, and that exceeded the whole capital and

Perth Amboy Gas Light Co. *v.* Middlesex County Bank.

surplus of the county bank.  He then suggested to the bank examiners that the bank should immediately be closed; but they suggested to him that it was possible there was a mistake in the books of the Park Bank, and that it would be a great injury to the bank and its creditors to close it if there really was no necessity for so doing, and suggested that they should go to New York immediately and ascertain the situation beyond all doubt.  This was done.  The president and one of the bank examiners went to New York and verified the report of Mr. Convery.

The bank continued business until its regular closing hour of three o'clock.  So that it appears that it actually conducted business about one hour after the president had received the information from Mr. Convery of the true situation of affairs.

The bank did not open its doors on Friday morning, July 14th.

*Mr. Richard V. Lindabury,* for the general creditors of the bank.

*Mr. Edwin B. Williamson,* for the Lehigh Valley railroad.

*Mr. John R. Hardin,* for the Essex County National Bank.

*Mr. Charles T. Glen,* for the National Newark Banking Company.

*Mr. John W. Beekman,* for J. J. Nash.

*Mr. James M. Chapman,* for J. W. Fox.

*Mr. James Parker,* for John Hilsdorf.

*Mr. James S. Wight,* for Crosby & Hill.

*Mr. George M. Keasbey,* for the Raritan Hollow and Porous Brick Company.

PITNEY, V. C.

Before considering the several claims of the appellants, with their individual characteristics, it is well to determine the principles applicable to cases of this kind. And, in the first place, it is to be borne in mind throughout that this is a contest between the different creditors of the bank, and not a contest with the bank itself as a corporation, or with any of its officers. It is not a question of whether the officers and directors of this bank, other than the cashier, who is now serving a term of penal punishment for his misconduct in connection therewith, are personally liable, either civilly or criminally, for their failure, through neglect, to ascertain the peculations of the cashier; but it is a question whether any one of these creditors, who are all, confessedly, honest creditors, and entitled to their pay in full if there were funds enough in the hands of the receiver to make such payment, shall, in default of sufficient funds for that purpose, have a preference over the others.

In the start we are met—as against any such preference—with the general rule prevailing in courts of equity that equality is equity.

The nature of the contract which arises between an ordinary depositor and an ordinary bank of deposit, upon the making and receiving a deposit, is perfectly well settled. It is not a contract of bailment, but it is a contract of loaning of money, and places the parties in the attitude of debtor and creditor. When the depositor hands money to the receiving officer of the bank, and it is accepted by the bank as such, the bank becomes a debtor to the depositor for the amount thereof, provided it is not directly or indirectly made in payment of a debt due from the depositor to the bank.

There is a possible exception to this in the case of a deposit of something other than cash, or other than a check of another depositor, upon the same bank, drawn in favor of the party depositing it. In the last-mentioned case, as soon as accepted, the check is charged to the drawer and credited to the payee. No money passes. It is a mere change of credit. The effect is precisely the same, however, so far as related to the character of the transaction, as if actual cash had been deposited. But

Perth Amboy Gas Light Co. *v.* Middlesex County Bank.

where the deposit consists of checks or drafts drawn on a third party, whether a bank or an individual, the result may be (1) either an increase of the debt from the bank to the depositor, or (2) a mere bailment of the check or draft, with the bank as an agent to collect the same for and on account of the depositor, and credit him with the amount when collected. The actual result depends upon either what actually passes between the parties at the time, or what the custom and practice prevailing between them is, and upon the situation of the account between the dealer and banker. If a depositor deposits a check or draft on a third party with the understanding, either expressed or implied, that he is to draw against it at once as if it were cash, and the bank agrees to accept it and treat it as cash, and the depositor draws against it before the amount is realized by the bank, then it is properly treated as a deposit of cash. Or if the depositor is already indebted to the bank, and the deposit is received in whole or partial payment, the same result follows. But in the absence of an understanding or situation of this kind it is a mere bailment.

The subject was discussed by Mr. Justice Nixon, in *Balbach v. Frelinghuysen, 15 Fed. Rep. 675* (at *p. 682*), and I concur in his conclusions as there stated.

The language of Chancellor Zabriskie, speaking for the court of errors and appeals, in *Titus and Scudder v. The Bank, 9 Vr. 588* (at *pp. 592, 593*), is instructive on this topic.

In cases where the result of the contract is that of lending and borrowing, the matter is closed when the deposit is made, and the depositor can, in case of insolvency, reclaim his deposit, as against the general creditors of the bank, only upon certain conditions. First, he must show that the officers of the bank who transacted the business with him knew of the insolvent condition of the bank at the time they accepted his deposit, and were guilty of actual fraud in accepting it. Second, he must be able to trace and follow his deposit into the assets which came into the hands of the receiver or assignee.

The case was likened by counsel in argument, and I think correctly likened, to that of a trader who, knowing that he is insolvent, but whose credit is still good, goes into the market,

and, on the strength of that credit, buys goods for the purpose either of swelling his general assets, or for the purpose of preferring some particular creditor, knowing at the time he makes the purchase that he will not be able to pay for the goods. In such case he commits an actual intentional fraud upon the seller of the goods, and the seller, upon being informed of it, may rescind the contract of sale and recover the very goods, if he can find them and they have not passed into the hands of a *bona fide* purchaser for value.

So if the unsuspecting depositor in a bank, supposing the bank to be solvent, makes a deposit, and it is accepted by the officers of the bank with full knowledge that they never will be able to pay it back to him, he may rescind the contract of lending and reclaim his deposit from the assignee of the insolvent bank, provided he can follow and find it and it has not passed into the hands of a *bona fide* purchaser. And if it appears that his deposit was in cash and that the very money that he deposited was in the vaults of the bank at the time it closed its doors, and came, necessarily, into the hands of the assignee or receiver, he may reclaim it, although he may not be able to identify the very coin or bills which composed the deposit. This last is an extension of the rule as it formerly stood. The reason of it is that it is clearly proven that the assets of the bank are actually increased by the amount of the deposit, and that the very cash came to the hands of the receiver or assignee.

This was held by the circuit court of the United States for the district of Indiana, in the case of *Wasson* v. *Hawkins,* reported in *59 Fed. Rep. 233.* The opinion in that case is well reasoned and contains a reference to most of the authorities up to that date (1894), and was relied upon by counsel on both sides in this case. The cause arose on demurrer, and I will stop to state the admitted facts, namely, that five minutes before the bank closed its business on the last day that it was open the plaintiff deposited in the bank a sum of money in cash and another sum in checks drawn on other banks, and that all of the checks were received as cash and credited to the depositor's account in his pass-book; that no part of the actual cash deposited was paid out by the bank prior to its suspension, but remained in the

bank until after the appointment of the receiver; and the checks so deposited were, on the following morning, collected by a clerk in the employ of the bank, and the proceeds held by the bank until the appointment of the defendant as receiver, when such proceeds were delivered into his hands as such receiver. The bank was known by the president to be insolvent. It was held on the statement of these facts that the case was made out against the receiver. The judge, in delivering judgment, states his conclusions as follows:

"The reception of the money and checks, under such circumstances, was a fraud upon the plaintiff, and entitled him to rescind the transaction, and recover back his deposit from the bank. The keeping of the bank open, and the conducting of its business in the usual manner, constituted a representation to its customers of the solvency of the bank, upon which they had the right to rely; and, if the bank was known to be insolvent by the officers who were charged with its management, the concealment of that fact from a person about to make a deposit would constitute a fraud upon him. The title acquired by the bank to the money and checks deposited under such circumstances would be voidable at the election of the depositor, who could bring suit to recover his deposit without any previous demand. The bank would become a trustee *ex maleficio,* and would hold the deposit for the use of the depositor and subject to his right of reclamation."·

In contrast, but, as I think, not inconsistent with that case, is the case of *In re North River Bank,* in the New York supreme court, General Term, *14 N. Y. Sup. 261,* where the deposit was made about two hours before the bank closed, and the cash became commingled with the cash of the bank, and large sums of money were paid out upon checks after the deposit, so that it could not be known that the money remained there at the closing of the bank.

In disposing of the matter, Mr. Justice Van Brunt said that the case was distinguishable from *Craige* v. *Hadley, 99 N. Y. 131.* In the latter case the deposit was of drafts on New York, sent by the insolvent bank at Buffalo to Brown Brothers & Company for collection, and by them collected. To the suit against

the receiver of the insolvent bank Brown Brothers were made parties defendant because they still had the money in their hands, and paid it into court in discharge of their liability to account, so that the money was capable of being followed and identified. While in the *North River Bank Case,* to use the language of the learned judge: "The amount deposited by the petitioner had gone into the general funds of the bank. There is no proof that it ever reached the hands of the receiver, and there is no proof but that it has lost its identity. There is no pretence that any particular $533.42 which came into the hands of the receiver was the $533.42 deposited by the plaintiffs, *non constat,* but that it may have been paid out during the one or two hours that the bank was doing its business. *Unless the money can be traced, the petitioner could claim no preference.*"

The nature of the contract between the depositor and the bank was stated clearly by Mr. Justice Andrews in the case of *Craige* v. *Hadley, supra.*

And the similarity of the case of a banker who receives a deposit, knowing he is insolvent, and that of a trader who purchases goods under like circumstances, was stated and maintained by the court of appeals of New York in the anonymous case reported in *67 N. Y. 599.*

It was argued by the counsel for the creditors that it was not necessary to show that the very cash deposited came into the hands of the receiver or assignee, provided it sufficiently appear that the amount of the assests in his hands are increased to that extent; and reference is made to the language of the late Justice Bradley, in *Frelinghuysen* v. *Nugent, 36 Fed. Rep. 229* (at *p. 239*), where, in stating generally the rule in such cases, and after speaking of the right to follow property, he says: "But if it became confused with other property of the same kind, so as not to be distinguishable, without any fault on the part of the possessor, the equity was lost. Finally, however, it has been held as the better doctrine that confusion does not destroy the equity entirely, but converts it into a charge upon the entire mass, giving to the party injured by the unlawful diversion a priority of right over the other creditors of the possessor. This is as far as the rule has been carried."

I do not understand the language of the learned judge to bear the interpretation put upon it by. the counsel of the appellant creditors. I do not think he meant to say that there could be what he calls "a charge upon the entire mass," unless it appeared affirmatively that the identical contribution to the mass still remained a part of it. In other words, I am unable to perceive any necessary conflict between the language used by Mr. Justice Bradley and that used by Mr. Justice Van Brunt. It is manifest from the context that what Mr. Justice Bradley said was *obiter,* and written without any intention to lay down an exact rule. He was there dealing with a question of the investment of the moneys of the bank in personal property, which was attempted to be reclaimed by the receiver.

I think the rule is stated with accuracy by Mr. Justice Baker, in *Wasson* v. *Hawkins, supra* (at *p. 236*), thus: "It is charged in the bill, and admitted by the demurrer, that the identical coins and bank notes deposited by the plaintiff remained in the bank when it stopped business, and came into the hands of the receiver, who now has them in his possession as a part of the general mass of coins and notes held by him as such receiver. In such a case the identification is sufficient to entitle the depositor to follow and reclaim the deposit made by him. Although the identical coins and bank notes cannot be ascertained, yet, as it is admitted that so much in coins and bank notes belonging to the plaintiff is in the common mass, he is entitled, in equity and good conscience, to take so much out. If he does not withdraw from the common mass the very coins and bank notes deposited by himself, no injustice is done, for he leaves an equitable amount of his own in place of every coin or bank note deposited by another."

The rule so stated is supported by what was decided in the *Matter of Cavan* v. *Gleason, 105 N. Y. 258* (at *pp. 262, 263*), and also in *Atkinson* v. *Rochester Printing Co., 114 N. Y. 168.* At *p. 175* the court says: "The fact that the defendant became a creditor of the insolvent bank through the fraud of its officers, and the bank a trustee *ex maleficio,* gave the defendant no right to a preference over other creditors, unless it could trace and recover its property."

Against this general result the appellants rely particularly upon the case of *Somerville* v. *Beal,* decided by the circuit court of the United States for the district of Massachusetts, and reported in *49 Fed. Rep. 790,* and again, on appeal, in the circuit court of appeals, in *50 Fed. Rep. 648.* That case was referred to by Mr. Justice Baker in *Wasson* v. *Hawkins.* It was a suit by the city of Somerville to recover from the receiver of the Maverick National Bank the proceeds of certain checks, and, like *Wasson* v. *Hawkins,* was heard on demurrer. The checks were deposited just before the failure of the bank, and were drawn on other banks, but finally collected by the bank examiner who took possession of the bank, and the proceeds held by him and turned over to the receiver, and were kept by him separate and distinct from the other funds of the bank. And it was held that, as the bank was irretrievably insolvent at the time the deposit was made, and known to be so by the officers of the bank who received the deposit, the demurrer to the bill should be overruled. The principal question argued was whether or not the checks became the property of the bank by reason of their having been endorsed for deposit and accepted by the officers of the bank as a deposit and credited outright to the city on its bank-book.

Then, returning to the case in hand, with regard to the knowledge of insolvency by the president of the bank, who was momentarily in its management at the time when these deposits were received, the evidence is quite plain that he, nor any of the other officers of the bank, except the cashier, did not know or suspect, or in anywise realize the true situation of the bank.

Against that result two suggestions were made. First, that the fact of shortage in the package of the savings bank money on Monday morning, coupled with the failure of the cashier to appear, was so strong an indication of a default and direct theft that the officers should have acted upon it immediately. But it is impossible to believe that the president of the bank did not act in perfect good faith in honestly supposing that the story of the cashier was true. He was of highly respectable family; his father lived in the neighborhood, was a man of wealth and respectability, and bondsman for his son to a large amount. Besides, it is to be observed that the suspicions of the officers

were directed more particularly toward the theft from the savings bank than toward any from the county bank; and an inspection by Convery of the state of the account of the county bank with the Park Bank was a mere incident to the investigation of the affairs of the savings bank and the safety of their bonds deposited for safe keeping in New York City.

But, in the second place, the counsel for the appellants take the broad ground that the officers of the bank were so negligent in their management as to have almost shut their eyes to the actual truth, and they must be chargeable with knowledge of such facts as they could have easily learned by a slight examination.

It must be admitted that the habitual neglect of the officers of the bank to regularly and periodically examine and verify the account of the county bank with the Park Bank, in New York, which they could have done very easily by looking into the reconcilement sheets and examining the vouchers, which were not concealed from them, shows great neglect on their part, and furnishes a strong argument in favor of their personal liability to make good to the receiver the losses which have been incurred. But that is not the question here. That question is simply whether the president of the bank was guilty of actual fraud in accepting the deposits in question. A careful examination of the evidence satisfies me that there is no ground for any such position. He was deeply interested in the welfare of both banks. Not the least connection is shown between him and the dishonest cashier in any of the latter's transactions. And I am of the opinion that it is actual, as distinguished from constructive, fraud, and culpable negligence, that is necessary in order to maintain the appellants' cases.

Of course, it almost goes without saying that the fact that the cashier knew for months that the bank was insolvent is not notice to the other officers of the bank. It might as well be argued that an owner of a chattel which has been stealthily stolen from him by his employe is chargeable with notice of such theft and estopped from asserting his title to the stolen chattel when found. The authorities are all against the appellants in this respect. It is not necessary to cite them. And if

that contention should prevail, and the officers of the bank be charged with knowledge of what they might and ought to have known, then they are chargeable with the knowledge of the insolvency of the bank for several months before it failed, and all the depositors who made deposits after it became insolvent would be entitled to a preference—a result which would, probably and almost certainly, bring in all upon an equal footing.

But, it is argued that, granting that the conduct of the president, between Monday morning, July 10th, and Thursday at two o'clock of July 13th, is excusable and consistent with honest intentions, yet that when he received, at about two o'clock on the day last named, the phonetic communication from Mr. Convery giving the state of the account of the county bank with the Park Bank, he must be chargeable with actual knowledge that the county bank was insolvent, and that his conduct in allowing it to remain open for one hour cannot be justified; and further stress is laid on the fact that after the regular .closing of the bank for business with its regular dealers at three o'clock, the accounts were made up and checks on foreign banks were forwarded for credit, especially with the Park Bank.

The circumstances which occurred on the receipt of the information from Mr. Convery by the president and the two bank examiners have already been stated. The president proposed immediately to close the bank. The examiners advised against it; and suggested the possibility of a mistake and the propriety of immediately proceeding to New York to verify Mr. Convery's information. The only train that would carry them thence in time to make such verification on that day left in a very few moments. There was no time for much consideration, and the president yielded to the suggestion of the bank examiners.

Now, just here, I cannot refrain from mentioning what I think was a serious oversight by the three parties—the president and the two bank examiners—and that was this: they should have simply given directions to the receiving teller to segregate each deposit which was received from that time on, and keep it separate from the funds of the bank, and if checks on the bank were deposited, to hold them without charging them up to the drawers of the checks, so that, in case it turned out that the

bank was insolvent, they could be protested for non-payment by reason of the failure of the bank. That course, as I am well informed, has been adopted under like circumstances; and it is to be regretted that it was not adopted in this case. But so far as appears from the evidence developed before me, it makes little difference in this case, for, as will appear hereafter, most of the claims are founded on credits made earlier in the day. Then, also, the clerk should have been instructed not to send off any foreign collections for the day until further advice from the president.

But I cannot find, as a matter of fact, that the failure to think of this plan, in the confusion and excitement of the few moments given for consideration, amounted to actual fraud.

The question of the effect of sending off checks to other banks after the bank closed, and after the president, on arrival at New York, became thoroughly satisfied of the situation of the bank, is, as to at least two of the claimants, a serious one.

Another question, which affects quite a large sum of money, is as to whether if any of the appellants are entitled to relief under the law as above laid down, and supposing the president to have been guilty of fraud, they can have such relief where the deposit was made in checks drawn on the insolvent bank; and that question must depend, it seems to me, upon the question whether or not it is possible for the depositor to bring his case within the rule above stated, which requires a tracing of the deposit. When a depositor deposits a check of another party on the bank in which he deposits, no money actually passes. The transaction is a mere transfer of credit. The bank owed the drawer of the check a certain sum of money; the drawer, by his check, ordered that money paid to the depositor; the depositor presents the check, and, instead of asking for the money, he asks for credit on his account for it. The result is that the bank, by accepting the check, charged it to the drawer and reduced its indebtedness to him just so much, and by crediting it to the depositor increased its indebtedness to him just so much. The assets of the bank are not thereby increased; and it would seem impossible to hold that there can be any tracing of the deposit. There is no money or coin mingled with that of the bank, and

the depositor cannot say, "I have handed you money; hand it back to me." Among the numerous authorities cited by the counsel and referred to by the judges in their opinions, I can find none for the position that any such case can be brought within the rule as above stated.

With these general statements, I come to the consideration of each particular claim by itself.

### NEWARK BANKING COMPANY AND ESSEX COUNTY NATIONAL BANK.

The two several claims of the Newark Banking Company and the Essex County National Bank, after eliminating from the latter the items consisting of checks on other banks forwarded to the county bank, which have been adjusted between the parties, stand on substantially the same footing. They consist entirely, as I understand the case and the proofs, of items of checks drawn on the county bank, or of notes payable there. The practice between the appellant banks and the insolvent bank was, on the afternoon of each day, after the close of the appellant banks, to make up a list or package of checks of the character just stated, and mail them to the county bank. They were received by the county bank in the regular course of mail, early the next morning, and were immediately dealt with by charging them up to the accounts of the drawers of the checks, and crediting them to the appellant banks severally. The arrangement between them was that, at stated times, the county bank was to pay, and did pay, the appellant banks the balance then due, by draft on New York. The items which reached the county bank on the morning of the 13th of July—the last day it was open—were duly credited to the appellant banks, and there is no proof, or ground for inference, that any actual cash was received on any of them or that any of them were credited to the appellant banks after the morning hour. Unless I have misapprehended the details of the several claims and the evidence of the witnesses with regard to them, they can have no preference for any part of their claims other than what has already been given to the Essex County Bank.

### LEHIGH VALLEY RAILROAD.

The same is true of the Lehigh Valley railroad. So far as appears, its claim consists entirely of deposits made from day to day with the county bank in the usual course of business. There is no proof, or ground for inference, that any of the items deposited are exceptional in their character.

### JAMES J. NASH.

The claim of James J. Nash is exceptional in its character. It is based upon divers drafts on third parties living at a distance from Perth Amboy, deposited with the county bank, so that the drafts were to be collected through correspondent banks, and the claimant has already attempted to intercept the payment of the proceeds of those drafts by those banks to the receiver. If he shall fail in that, and the amount due from the correspondent banks of the county bank is sufficient to cover it, it may be that his case will finally be placed on the same footing as the same sort of items in the claim of the Essex County Bank. It is proper to say that Mr. Nash is not an appellant, but an applicant directly to the court.

### J. W. FOX.

The claim of J. W. Fox consists simply of a balance due him as a daily depositor in the bank. It stands on the same footing as that of the Lehigh Valley railroad. It cannot be admitted except as a general claim.

### COLEMAN & BOYNTON.

The claim of Coleman & Boynton, by Horace C. Coleman, for $766.81, stands on the same footing as that of the Lehigh Valley railroad and that of Fox. He makes a statement in detail of the whole and a special reference to the fact that $227.71 was de-

posited in the bank on the day it failed—July 13th. But it does not appear at what time it was deposited, nor of what the deposit was composed.

### GEORGE C. BROWN AND THE RARITAN HOLLOW AND POROUS BRICK COMPANY.

The several claims of George C. Brown and the Raritan Hollow and Porous Brick Company stand on the same footing, as I understand them, as to part of each. The claim of Brown is based, in part, upon a draft for $1,000, drawn by R. M. Monroe on Henry S. Hovey, of Boston, payable to the order of Brown & Sons, and endorsed by them to him and by him, and deposited in the county bank on the 12th of July. On the 14th of July, as alleged in the claim (but probably on the evening of the 13th), it was sent by the county bank to the Park Bank, with other items, to be credited to the county bank. The drawee (Hovey) declined to pay (probably because payment was stopped), and the Park Bank is about to bring an action to recover the amount due on the draft.

The claim of the Raritan Hollow and Porous Brick Company is based, in part, upon a check of $2,500, drawn by the brick company on the Manufacturers National Bank of Newark, to the order of the county bank, and deposited with that bank on the 13th of July, and by the county bank forwarded, on the evening of the 13th—the last day it was open—to the Park Bank for collection. Payment on that check was stopped at the manufacturers bank, and the Park Bank has brought suit upon it against the brick company.

The brick company and Mr. Brown claim a preference in case they are obliged to pay the draft and check in question.

Now, if instead of there being an indebtedness from the insolvent bank to the Park Bank, there was an indebtedness from the Park Bank to the insolvent bank, sufficient in amount to cover these items, and other items like them, then I should say that those claims come within the principle which induced the receiver, under the advice of counsel, to accede to the claim of the Essex County Bank for preference of like items. They

Perth Amboy Gas Light Co. v. Middlesex County Bank.

were sent to the Park Bank after it was finally known that the county bank was insolvent; and, had the president or the examiner who remained at Perth Amboy been sufficiently thoughtful and alert, they should have prevented the forwarding of the draft and check to the Park Bank. As it is, there is danger, under the rule that prevails in that state, as illustrated by the case of *Bank* v. *Lloyd, 90 N. Y. 530,* that they may be obliged to pay them. Be that as it may, I am unable to see how, under the principles which I have found to be established as governing cases of this kind, these claims now in question can be allowed, and for the simple reason that the fund cannot be followed. It is swallowed up and lost in the general indebtedness of the county bank to the Park Bank.

I think *Terhune* v. *Bank of Bergen County, 7 Stew. Eq. 367,* supports that view.

### JOHN HILSDORF.

I next deal with the case of John Hilsdorf for $1,887.93. On this a special claim for preference is made for $1,469.93, which was deposited with the bank, on the 13th of July, under these peculiar circumstances: Hilsdorf had negotiated a loan from the savings bank, to be secured by a bond and mortgage for $1,500. The loan had been passed and the mortgage duly recorded, and he was entitled to the money, less the expenses, which, being deducted, left the precise sum of $1,469.93. He called at the bank early on the morning of the 13th to get his money. He kept a pass-book account with the county bank. He saw Mr. Watson, the president, and told him he wanted his money. Mr. Watson handed him a draft drawn by the Perth Amboy Savings Institution to his (Hilsdorf's) order, on the county bank, which Hilsdorf endorsed and handed it back, with his pass-book, to Mr. Watson, who gave him credit for it, and handed him back his pass-book. This occurred between ten and eleven o'clock in the morning.

I cannot differentiate this case from the others which have been dealt with. A very strong argument was made before me in behalf of this man, in which the hardship of the case was dwelt

upon; but the argument tended more to show that Mr. Hilsdorf has a claim against the savings bank, than to show that he has any right to a preference over other creditors as against the receiver of the county bank.

### CROSBY & HILL.

The next and last claim is that of the firm of Crosby & Hill. It is for $3,965.49, composed of deposits made from day to day for several days before the failure, that of the 13th of July, amounting to $150.75, being made a few minutes before the bank closed at three o'clock. It was composed partly of check and partly of cash, and the check was sent without being endorsed, so that the messenger was obliged to return to get it endorsed. The proofs do not show just how much of that sum was cash and how much was check, nor upon what bank the check was drawn.

Under the peculiar circumstances, I think that so much of this deposit as was in cash may be fairly inferred was not paid out by the teller and came to the hands of the receiver.

This, I believe, disposes of all the appeals and claims that were presented, and I will advise a decree in accordance with these views.