CITY OF PHILADELPHIA v. ECKELS et al.

(Circuit Court, E. D. Pennsylvania. June 8, 1896.)

### No. 3.

**1. BANKS—DEPOSIT IN INSOLVENT BANK—TITLE TO FUNDS.**

The treasurer of a city, in accordance with an arrangement with a bank in which he kept an account as treasurer, deposited at night funds which had come into his office after banking hours, and which belonged in part to the city and in part to the state, for safe-keeping until the next morning, when, as was his custom, he separated out the portion of the funds belonging to the city, and had the same placed to his credit on his bank book. On the morning in question this was done before the hour for opening the bank. The bank was insolvent, and known to be so by its officers, and was at the time virtually in possession of the bank examiner, who took formal possession before the time for opening arrived, and the bank was not thereafter opened for business. The treasurer at once demanded the return of the funds, which were still in the bank, but they were retained by the examiner, and subsequently turned over to the receiver, who credited them to the treasurer on the bank books. *Held*, that such funds did not become the property of the bank, and were recoverable by the city from the receiver.

**2. BANKS—TITLE TO CHECKS AND DRAFTS DEPOSITED.**

The title to checks and drafts deposited in a bank for credit to the depositor's account remains in such depositor until they are collected, although the amount thereof is at the time entered on his book as a credit.

This was a proceeding against the comptroller and receiver of a national bank to recover funds claimed to be the property of the complainant.

J. W. Catharine, Jr., and C. F. Warwick, for plaintiff.

Read & Pettit, for defendant.

ACHESON, Circuit Judge. The material facts of this case, as established by the proofs, are these: John Bardsley, the treasurer of the city of Philadelphia, acting in his official capacity, and under authority of ordinances of the city, kept an account with the Keystone National Bank in his name as city treasurer, and from day to day deposited therein moneys of the city exclusively, and from time to time drew checks against the same on behalf of the city. Under an arrangement entered into between Bardsley and the bank, it was his common practice to deliver to the bank, after banking hours, taking a receipt therefor, funds belonging in part to the city and in part to the commonwealth of Pennsylvania, which came into the city treasurer's office too late in the day to deposit, for the purpose of safe-keeping in the vaults of the bank overnight; and on the morning of the succeeding day, after the share of the commonwealth in the funds was ascertained and deducted, a deposit ticket would be made out by the city treasurer, and the part of the funds belonging to the city would be deposited in the usual way to the credit of the city treasurer in his said account. Late on the afternoon of March 19, 1891, after the close of banking hours, Bardsley, in accordance with the practice above explained, delivered to the bank, for safe-keeping in its vaults overnight, the fund here in controversy, namely, $18,500.12, together with some other moneys,

all of which belonged in part to the city and in part to the commonwealth, their respective shares therein not being then ascertained. On the morning of the next day,—March 20th,—between the hours of 9 and 10 o'clock (at which latter hour the bank customarily opened for business), a messenger, having with him the city treasurer's bank book and a deposit ticket showing the amount of the aforesaid funds belonging to the city, was sent from the city treasurer's office to the bank, and a credit for the latter amount was entered in the bank book. The bank was then insolvent, and was insolvent prior to March 20th, and its insolvency was known to the president of the bank. As early as February 28, 1891, the bank examiner had reported to the comptroller of the currency that the bank was insolvent. On the night of March 19, 1891, the comptroller of the currency, by wire, directed William P. Drew, bank examiner, to repair to the Keystone National Bank the next morning (March 20th) at 9 o'clock. Mr. Drew arrived at the bank at the time designated, and at 9:40 a. m. of that day received orders from the comptroller to close the bank, and thereupon the bank examiner ordered the bank's officers not to open the bank. The receiving teller, however, while the examiner was in the director's room, without the knowledge of the examiner, opened his desk before 10 o'clock, and received three or four deposits. About 10 o'clock the examiner directed the teller to receive no deposits, and to put those received aside, to be returned to the depositors. The bank was not opened for business after March 19, 1891. No money was paid out by the bank on March 20th. Exclusive of the fund in controversy, the city treasurer, on March 19 and 20, 1891, had to his credit in the bank in his said account a balance of not less than $399,363.21. On the morning of March 20th the city treasury officials went to the bank, and demanded the return of the fund here in dispute. The bank examiner was about to return the fund, when he was advised to hold it until he received further instructions from his superiors, and he retained the fund. At the time of this demand the fund was in the bank, and it could have been returned. In the main, it consisted of country checks and checks on trust companies, etc., which amounted to $14,130.32. These checks were afterwards collected by the bank examiner, who remained in control of the bank and its affairs until Robert M. Yardley was appointed receiver thereof. The proceeds of the checks, together with the cash which constituted the balance of this fund, were paid over by the bank examiner to the receiver. This fund was not credited to the city treasurer upon the books of the bank until May 18, 1891, after the receiver took possession, and such credit was entered by the receiver.

Upon this state of facts it is quite plain to me that the city is entitled to the return of this fund. It was not deposited to the credit of the city treasurer on March 19th, but was left for safekeeping in the vaults of the bank overnight. The precise interest of the city therein, as distinguished from the interest of the commonwealth, was not then known. Undoubtedly, the fund was left merely for safe-keeping, subject to the right of withdrawal by the city treasurer. The entry of credit in the city treasurer's bank book

on the morning of March 20th, under the circumstances, did not create the relation of debtor and creditor, or devest the title of the city. That entry was not conclusive, either upon the bank or the city. At the time it was made, the bank was virtually, if not actually, in the hands of the government officials. The functions of the bank for the transaction of ordinary business were then suspended. Moreover, the bank being insolvent, and about to pass into the hands of a receiver, it would have been a fraud on the city for the bank to accept a deposit of this fund, and on that ground alone it could have been reclaimed. As respects the checks, most clearly the title would have remained in the city, even had there been a deposit, for then the bank, in the first instance, would have been a mere collecting agent of the city. Beal v. City of Somerville, 1 C. C. A. 598, 50 Fed. 647, 17 L. R. A. 291. I entertain no doubt, however, as to any part of this fund. The city never lost its title thereto, either in whole or part. The decision of the supreme court in Railway Co. v. Johnston, 133 U. S. 566, 10 Sup. Ct. 390, 33 L. Ed. 683, I think, conclusively establishes the right of the city to recover.

Let a decree be drawn in favor of the complainant in accordance with the views expressed in the foregoing opinion.