## LASER GRAIN CO. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. March 9, 1918.)

No. 4732.

1. CRIMINAL LAW ⊚⇒448(3)—EVIDENCE—INTERSTATE COMMERCE—CORPORATION —INTENT OF AGENTS.

In a prosecution under Act to Regulate Commerce Feb. 4, 1887, c. 104, § 10, par. 3, 24 Stat. 382, as amended by Act March 2, 1889, c. 382, § 2, 25 Stat. 857, and Act June 18, 1910, c. 309, § 10(1), 36 Stat. 549 (Comp. St. 1916, § 8574), against a corporation for fraudulent claim for injury to shipment, a corporate officer who signed letters making claims for injuries to a shipment is entitled to testify as to his intent, it appearing that the claims were prepared by his bookkeeper, for the corporation could act only through its officers or agents, and the intent of the officer is that of the corporation.

2. CARRIERS ⊚⇒38—CRIMINAL LAW ⊚⇒448(3)—FRAUDULENT CLAIM—EVIDENCE —INTENT.

Where it was asserted that a claim against a railroad company was fraudulent and that the pressing of the claim was a violation of the Act to Regulate Commerce, § 10, par. 3, as amended, the acts and sayings of one prosecuting or pressing the claim are generally admissible on the question of intent, and he may also testify as to his intention.

3. CARRIERS ⊚⇒38—INTERSTATE COMMERCE—FRAUDULENT CLAIM—"FILING."

An indispensable element of the charge in the indictment was that the defendant filed with the St. Louis, Iron Mountain & Southern Railway Company a fraudulent claim for an excessive amount of damages. The "filing" of a paper or claim with a corporation is not complete until the document is delivered to and received by an officer or agent thereof who had authority to receive, file, or act upon it. There was no substantial evidence of any such filing of the claim, or of any of the documents making it, with any such officer or agent of the railroad company, and for that reason the court should have instructed the jury to return a verdict for the defendant.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, File.]

4. CARRIERS ⊚⇒38—INTERSTATE COMMERCE—FRAUDULENT CLAIM.

In a prosecution under an indictment charging a violation of the Act to Regulate Commerce, § 10, par. 3, as amended, by filing an excessive claim with a railroad company, evidence *held* insufficient to take the question of the filing of the claim to the jury.

In Error to the District Court of the United States for the Eastern District of Missouri; David P. Dyer, Judge.

The Laser Grain Company, a corporation, was convicted of violating the Act to Regulate Commerce, as amended by Act March 2, 1889, and by Act June 18, 1910, relating to claims by shippers, and defendant brings error. Reversed and remanded for new trial.

⊚⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Walter H. Saunders, of St. Louis, Mo. (John S. Leahy and Irvin V. Barth, both of St. Louis, Mo., on the brief), for plaintiff in error.

H. B. Duncan, Sp. Asst. U. S. Atty., of Washington, D. C. (Arthur L. Oliver, U. S. Atty., and Vance J. Higgs, Asst. U. S. Atty., both of St. Louis, Mo., on the brief), for the United States.

Before SANBORN and SMITH, Circuit Judges, and TRIEBER, District Judge.

SANBORN, Circuit Judge. The Laser Grain Company, a corporation, was indicted in four counts and convicted of a violation of that part of the third paragraph of section 10 of the Act to Regulate Commerce, as amended by the Act of March 2, 1889, 25 Stat. 858, and the Act of June 18, 1910, 36 Stat. 549, which provides that:

"Any person, corporation, or company, or any agent or officer thereof, who shall deliver property for transportation to any common carrier subject to the provisions of this act, or for whom, as consignor or consignee, any such carrier shall transport property, * * * who shall knowingly and willfully, directly or indirectly, himself or by employé, agent, officer, or otherwise, by false statement or representation as to cost, value, nature, or extent of injury, or by the use of any false bill, bill of lading, receipt, voucher, roll, account, claim, certificate, affidavit, or deposition, knowing the same to be false, fictitious, or fraudulent, or to contain any false, fictitious, or fraudulent statement or entry, obtain or attempt to obtain any allowance, refund, or payment for damage * * * whereby the compensation of such carrier for such transportation, either before or after payment, shall in fact be made less than the regular rates then established and in force on the line of transportation, shall be deemed guilty of fraud, which is hereby declared to be a misdemeanor, and shall, upon conviction" be subject to fine or imprisonment, or both.

The first count of the indictment charged that after the defendant had caused a carload of peaches to be transported by several carriers, one of which was the St. Louis, Iron Mountain & Southern Railway Company, from Coal Hill, Ark., to Harrisburg, Pa., under the regular established through freight rates and the uniform bill of lading, and after the regular freight charges had been collected, it filed at St. Louis, Mo., with the St. Louis, Iron Mountain & Southern Railway Company a claim for $195.19 for damages to the peaches, and by the use of a false invoice represented that it had lost $195.19, and that the invoice price of the peaches at the place of shipment was $400, when it had not suffered loss in excess of $108.34 and the invoice price of the peaches did not exceed $320, and that in this way the defendant attempted to obtain from common carriers that transported the peaches $195.19 for its damages and thereby to render the compensation of the carriers for the transportation less than the regular established charges therefor. The other three counts of the indictment charged like attempts to obtain excessive damages by filing similar claims at St. Louis with the St. Louis, Iron Mountain & Southern Railway Company.

The Laser Grain Company has assigned 31 alleged errors in the proceedings which resulted in the judgment against it. It will be necessary to consider but two questions, however: First, was the company

deprived by the rulings of the court of its right to introduce competent and material evidence regarding its willful intent knowingly to attempt by false representations or invoices to obtain the allowance or payment of excessive damages; second, was there at the close of the trial any substantial evidence that the company ever filed at St. Louis with the St. Louis, Iron Mountain & Southern Railway Company, as charged in each count of the indictment, any claim for damages?

The trial proceeded in this way: The Laser Company admitted that there were legally established through routes and rates over the railroads of the numerous common carriers between the points between which the United States alleged that the peaches described in the indictment had been transported, that the peaches had been transported under uniform bills of lading by these common carriers, one of which was the St. Louis, Iron Mountain & Southern Railway Company, and that the lawful tariff rates had been paid for the transportation. The pertinent provision of the uniform bill of lading is:

"The amount of any loss or damage for which any carrier is liable shall be computed on the basis of the value of the property (being the bona fide invoice price, if any, to the consignee, including the freight charge if prepaid) at the place and time of shipment under this bill of lading."

The United States introduced evidence tending to show that T. S. Walton, the freight claim agent of the Missouri Pacific Railway Company, received at St. Louis by mail from the Laser Grain Company at Clarksville, Ark., where its office and place of business was, the four claims referred to in the indictment, each of which consisted of a letter of the Laser Company to Mr. Walton as such freight agent, a bill against the St. Louis, Iron Mountain & Southern Railway Company for the loss and damage claimed, an invoice and an affidavit of the loading condition of the peaches, that the clerks in the freight claim department of the Missouri Pacific Railway Company sent all these claims and papers to Louis Weiler, the freight claim agent of the American Refrigerator Transit Company, that he produced them at the trial, and that the amounts of the purchase prices of the peaches stated in the respective invoices forming a part of the claims exceeded the amounts of the actual purchase prices thereof. The United States called as a witness Thomas S. Laser, who testified, among other things, that he was the secretary and treasurer of the Laser Company in 1911 and 1912, when the claims in controversy were made; that his bookkeeper, Mr. Ludwig, prepared all the papers constituting the claims; that he signed one or two of the letters addressed to Mr. Walton as freight claim agent of the Missouri Pacific Railway Company, and his bookkeeper signed his name to the others; that he did not examine or know the contents of the invoices, or of the other papers that accompanied the letters; that the original invoices in the possession of the Laser Company and the drafts accompanying them show that the purchase prices of the peaches were less than those stated in the invoices sent to Mr. Walton among the papers constituting the claims. On his cross-examination, Mr. Laser's attention was called to the fact that it appeared from the original invoices that one of the shipments of peaches was invoiced to the purchaser at $320, while

the invoice accompanying the claim was for $400, and he was asked to explain the discrepancy. Counsel for the United States objected, the objection was overruled, and this colloquy occurred.

"A. That paper was not intended for an invoice—

"The Court: It does not make any difference what the paper was intended for. We want to know what it was put in for.

"A. It is not an invoice.

"Q. What is it?

"A. It is simply a statement of our loss on the car, to arrive at a basis of our loss on the car. We did not intend it for an original invoice, and I so explained to Mr. Weiler.

"Q. I want to find out how it comes when you sell peaches for 80 cents a bushel; you draw on the party for 80 cents a bushel, and when your claim is not paid by the consignee you come back and make up a claim against the railroad company for $1 when you have charged 80 cents for the peaches; that is what I am trying to find out.

"A. When the car arrived at destination, it was turned back on our hands. The car was refused. They arrived in damaged condition and were thrown back on us to handle to best advantage, or to get out of it any way we could. We were then forced to turn the cars over to the other fruit dealers where the cars were handled, to be handed there, and we were forced to pay them a commission ranging—they usually charge 10 per cent., and that was on freight and all. For instance, at Harrisburg, Pa., on one of these cars the freight alone is $400, approximately. Then when that car was sold there we would be forced to pay a commission of $40 on $400 of freight, in addition to our invoice price.

"Q. Then why do you not make a claim against the railroad company for that difference? Why do you say the invoice price of your goods is so much when it is not?

"A. That is what our bookkeeper intended and what I so explained to Mr. Weiler when I came here. Before we sued the railroad company, I told him and explained the discrepancy in the bill, and told him that that is how that was taken care of, and that if we were not entitled to that I was perfectly willing to settle on the invoice price; that I had the original invoice price, settle on that, and I would lose all the extra expense for handling, myself.

"The Court: That will do, and the conversation with Mr. Weiler will be stricken out as having nothing to do with this inquiry. The question is what was this done for?

"A. That is what it was done for.

"The Court: That will be stricken out.

"Mr. Saunders: We except to the action of the court."

Thereupon the witness testified that after the claims were sent from Clarkesville he went to St. Louis and called on Mr. Walton; that Mr. Walton referred him to Mr. Weiler; that he then went to Mr. Weiler in reference to these claims. Thereupon this colloquy followed:

"Q. Will you state what happened then?

"The Court (to Mr. Saunders): How many times do you want that ruled upon? It has been objected to and I ruled that any conversation with Mr. Weiler was incompetent.

"Mr. Saunders: I desire to make an offer of that proof.

"The Court: You have offered it and I have ruled upon the question. Do not ask him what he said to Weiler or what Weiler said to him. That is not competent, and you cannot introduce in this court what is sometimes permitted in other courts.

"Mr. Saunders: I do not desire to introduce anything but competent evidence.

"The Court: That is not competent.

"Mr. Saunders: I desire to make my record.

"The Court: You offer to prove what Mr. Weiler said to him. That was objected to and the court sustained the objection.

"Mr. Saunders: I have to show what Weiler said—

"The Court: You need not. Every presumption is in your favor as to what Weiler said. You do not have to state that. That is not necessary."

Counsel for the Laser Grain Company then asked the witness whether or not he filed the claim in good faith. The court sustained an objection that this was not proper cross-examination, and said, "It does not make any difference about his good faith." The witness was then asked, "Did you file this claim for the purpose of securing from the railroad company more than the actual loss that the Laser Company actually sustained?" but the court refused to permit him to answer, and exceptions were taken to all these rulings.

[1, 2] The knowledge of the falsity of the claim or invoice and the willful intent of the defendant to commit the offense denounced by this act of Congress are indispensable elements of the fraud which it declares to be a misdemeanor. It is not any company that by false statement as to the nature or extent of injury or damage, or by the use of a false bill or invoice attempts to obtain an excessive allowance or payment of damages, that is declared to be guilty of this fraud. It is any company that knowingly and willfully by false statement or representtion, or by the use of a false bill or voucher, knowing the same to be false, attempts to obtain an excessive allowance or payment of damages that is declared to be guilty of the misdemeanor. A corporation can know, intend to defraud, and willfully misrepresent only by and through the officer, agent, or employé in whom it vests the authority to know, to intend, to will, and to act for it. In the case at bar that officer, employé, or agent was Mr. Laser, its secretary and treasurer. He was the officer who signed two of the letters, whose name was signed to the two others by his stenographer, and it was by his direction that all of them were sent to Mr. Walton, the freight claim agent of the Missouri Pacific Railway Company. After he had sent them, he visited Mr. Walton regarding these claims and Walton referred him to Mr. Weiler, the freight claim agent of the Refrigerator Transit Company, to whom the Missouri Pacific freight claim department had sent the claims. Mr. Laser testified that he had a conversation with Mr. Weiler in which he explained to him the claims, the basis upon which these claims had been made, and that after this conversation he asked for a return of the papers. According to the testimony this was all done before the claims were filed with the St. Louis, Iron Mountain & Southern Railway Company, for, as will be shown later, there is no evidence in this record that they were ever filed. It is true that the writings by means of which the claims were made were prepared for Laser's signature and sending by Ludwig, his stenographer and bookkeeper; but there is no evidence that this stenographer had any authority to exercise the intent or will of the corporation knowingly and willfully to commit a fraud or a misdemeanor, and if he either intentionally or by mistake undertook to do so it would be a harsh and unjust rule that would deny to the responsible officer or agent who, on behalf of the company, caused the claims to be sent, and who negotiated regarding them with the parties who received the claims, the right to testify to

his intent, purpose, and the acts and conversations with the parties who received the claims in relation thereto. It cannot be possible that a stenographer by preparing a false claim or voucher for the signature of a superior officer or agent of a corporation who signs and presents the claim or voucher in the belief that it is true can estop the corporation from proving that the presentation was not made knowingly, intentionally or willfully.

The acts and sayings of one while prosecuting or pressing a claim alleged to be fraudulent are generally admissible upon the issue of his intention, his knowledge, or his fraudulent purpose, and the rule is universal that he may testify directly to his intent. The court below should have permitted Mr. Laser to testify to the intent and purpose with which he presented the claim and to the acts he did and the conversations he had with the parties to whom they were presented in order that this testimony might be considered by the jury in determining the nature of his intent and the extent of his knowledge.

[3, 4] At the close of the evidence the defendant requested the court to instruct the jury to return a verdict for the defendant. The gist of the charge in each count of the indictment was that the company on a certain day "did file with the said St. Louis, Iron Mountain & Southern Railway Company a claim" for an excessive amount of damages, and by the use of a false invoice, or voucher, did represent the purchase price of the peaches to be more than they were, and in that way it did attempt to obtain payment of excessive damages. Proof beyond a reasonable doubt of the filing of these claims at St. Louis with the St. Louis, Iron Mountain & Southern Railway Company thus became indispensable to a lawful conviction under this indictment. In United States v. Lombardo, 241 U. S. 73, 76, 77, 36 Sup. Ct. 508, 509 (60 L. Ed. 897) the Supreme Court approved and affirmed these words of the court below:

"Filing, it must be observed, is not complete until the document is delivered and received. * * * A paper is filed when it is delivered to the proper official and by him received and filed. Bouvier Law Dictionary; White [Hoyt] v. Stark, 134 Cal. 178 [66 Pac. 223, 86 Am. St. Rep. 246]; Westcott v. Eccles, 3 Utah, 258 [2 Pac. 525]; In re Van Varcke [Von Borcke (D. C.)], 91 Fed. 352; Mutual Life Ins. Co. v. Phinney, 76 Fed. 618 [22 C. C. A. 425]. Anything short of delivery would leave the filing a disputable fact, and that would not be consistent with the spirit of the act."

It was therefore necessary for the United States to prove that the claims were delivered by mail or otherwise to and received by some officer or employé of the St. Louis, Iron Mountain & Southern Railway Company who was authorized to receive and file them. The evidence of what was done with them has been recited. They were mailed to and received by T. S. Walton, freight claim agent of the Missouri Pacific Railway Company; the clerks in the freight claim department of the Missouri Pacific Railway Company sent them to Louis Weiler, the freight claim agent of the American Refrigerator Transit Company; and there they remained until they were brought into court by Mr. Weiler on the call of the United States. There is nothing in the evidence introduced in this case to prove that Mr. Walton or the clerks in his department, or Mr. Weiler, were officers or agents of the St.

Louis, Iron Mountain & Southern Railway Company, or authorized to receive, file, or act for it upon claims against it. No evidence has been discovered in the record that these claims were ever delivered to, or filed with, any officer or agent of the St. Louis, Iron Mountain & Southern Railway Company who was authorized to receive, file, consider, or act upon them, and, because there was no substantial evidence of the filing of any of these claims at St. Louis with the St. Louis, Iron Mountain & Southern Railway Company, the motion for a directed verdict for the defendant should have been granted.

As it is improbable that the other alleged errors, if any exist, which have been assigned, will be committed again, it would be a waste of time to treat of them. The judgment below must be reversed, and the case remanded to the court below for a new trial; and it is so ordered.