## In re GUBELMAN et al.

(Circuit Court of Appeals, Second Circuit. Dec. 7, 1925.)

No. 52.

1. Bankruptcy ⬤⟶467—On appeal from order dismissing reclamation claim in bankruptcy, court reviews both findings of fact and conclusions of law.

On appeal from order dismissing reclamation claim in bankruptcy, court reviews both findings of fact and conclusions of law.

2. Stipulations ⬤⟶3—Stipulation as to meaning of language in reclamation petition not binding on court.

Stipulation as to meaning of "the day said petition in bankruptcy was filed," as used in reclamation petition, held not binding on court on question of time when petition was legally filed, as affecting rights of parties.

3. Bankruptcy ⬤⟶152—When petition in bankruptcy legally "filed" stated; "filing."

Involuntary petition in bankruptcy presented to judge of District Court at 10:30 p. m. on particular day and filed in office of clerk of District Court at 9:30 a. m. following day, held not "filed" when presented to judge, or until lodged in clerk's office, within meaning of Bankruptcy Act, § 70a (Comp. St. § 9654), relating to vesting of trustee's title to property which, prior to filing of petition, bankrupt could have transferred; "filing" signifying delivery into actual custody of proper officer, and carrying idea of permanent preservation of thing as a public record.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, File.]

4. Records ⬤⟶7—Paper not "filed" until deposited with clerk of court.

A paper in a case is not filed by presenting it to the judge, but is filed only when deposited with the clerk of the court, for the purpose of making it a part of the records of the case.

5. Bankruptcy ⬤⟶140(3)—Receiver in bankruptcy of partnership banking house held entitled to proceeds of check.

Where check was received by partnership banking house on second day preceding filing of involuntary petition in bankruptcy, immediately credited to depositor's account, indorsed to another bank, which collected it the following day and credited bankrupts with the amount, held, relation of debtor and creditor between bank and depositor was established before filing of petition, and receiver in bankruptcy was entitled to proceeds of check.

6. Time ⬤⟶11—Account will not be taken of fractions of day, to defeat bankrupt's title to property.

Law will take no account of fractions of a day, to defeat bankrupt's title to property, under Bankruptcy Act, § 70a (Comp. St. § 9654).

7. Time ⬤⟶11—Exceptions to fiction that day is an indivisible period of time stated.

The legal fiction that a day is an indivisible period of time has numerous exceptions; one being that courts will disregard it where nec-

essary to protect a completed act, or save a vested right, or to determine conflicting rights of rival claimants, when they depend on priority in fact.

**8. Banks and banking ⬦⟹127—In absence of contrary agreements or notice, check or draft deposited and accepted as cash is property of bank.**

In absence of special agreement, or some notice to contrary, where check or draft is deposited in bank and accepted as cash, it becomes property of bank, which becomes debtor of depositor, with superadded obligation to pay on demand.

**9. Banks and banking ⬦⟹159—Generally checks deposited for collection remain property of depositor.**

Generally checks deposited for collection remain property of depositor.

**10. Bankruptcy ⬦⟹140(3), 212—Receiver in bankruptcy of partnership banking house held not entitled to proceeds of check not collected until after filing of petition in bankruptcy; claimants' allegation held not to show deposit of check.**

Where cashier's check, payable to a partnership banking house, "favor N. L. & A. P., Budapest," was received by payee on day preceding filing of involuntary petition in bankruptcy, credited to account of N. L. & A. P., indorsed to another bank, which at once credited it to payee's account, and collected it on succeeding day after filing of petition in bankruptcy, *held*, quoted words were equivalent to indorsement for collection only, and, notwithstanding credit was immediately given by both payee and collecting bank, receiver in bankruptcy was not entitled to proceeds collected after filing of petition, nor was allegation of complainants, N. L. & A. P., that they caused drawer bank to deliver check to bankrupts, sufficient to show transaction same as if claimants had themselves made deposit of check, there being nothing to show agreement to credit before collection.

**11. Bankruptcy ⬦⟹140(3)—Receiver in bankruptcy of partnership banking house held entitled to proceeds of cashier's check, previously credited to depositor's account.**

Where straight unrestricted cashier's check was, by agent, delivered on day preceding filing of involuntary petition in bankruptcy to payee partnership banking house, with letter explaining that it was for account of particular depositor, was credited on same day to depositor, indorsed to another bank, which on same day credited payee bank and subsequently made collection, *held*, payee bank, on crediting depositor's account, became owner of check, with relation of debtor and creditor between it and depositor, and receiver in bankruptcy of payee bank was entitled to proceeds, regardless of whether collection was made before or after filing of petition.

**12. Bankruptcy ⬦⟹212—Trustee's denial of knowledge or information sufficient to form a belief as to allegations in reclamation petition not admission thereof.**

Denial by trustee in bankruptcy of banking house of any knowledge or information sufficient to form a belief as to allegation in reclamation petition that bankrupts had wrongfully and fraudulently received deposits with intent to defraud petitioners *held* not admission of truth of such allegation, but sufficient to put petitioners to their proof.

**13. Bankruptcy ⬦⟹140(3)—Banking partnership, fraudulently receiving deposits, holds as trustee ex maleficio, subject to depositor's right of reclamation.**

Where members of banking partnership fraudulently receive deposits, knowing that they are hopelessly insolvent, depositors are entitled to rescind transactions, and partners hold as trustees ex maleficio, subject to depositors' right of reclamation from trustee in bankruptcy.

**14. Bankruptcy ⬦⟹140(3)— Rule relating to fraudulent receipt of deposits and depositor's right to reclaim stated.**

To render banking partnership's receipt of deposits fraududent, and give depositor right of reclamation from partnership's bankruptcy trustee, insolvency must have been of such a character that it was manifestly impossible for partners to continue business and meet their obligations, and must have been known to them when they accepted deposits.

**15. Bankruptcy ⬦⟹212—Depositors have burden of proving alleged fraudulent receipt of deposits.**

Burden of proving that deposits were fraudulently received by bankrupt banking partners having knowledge of hopeless insolvency is on depositors.

Petition to Revise Order of, and Appeal from, the District Court of the United States for the Southern District of New York.

In the matter of the bankruptcy of Oscar L. Gubelman and others, individually and as copartners doing business under the firm name and style of Knauth, Nachod & Kuhne. Claim of Alexander Latzko, and others, copartners doing business under the firm name and style of N. Latzko & A. Popper, opposed by Middleton S. Borland, trustee, was dismissed, and claimants petition to revise and appeal from such order. Affirmed in part, and reversed in part.

Brodek & Raphael, of New York City (Charles A. Brodek and Borris M. Komar, both of New York City, of counsel), for appellants.

Rosenberg & Ball, of New York City (George G. Ernst and Ralph F. Colin, both of New York City, of counsel), for appellee.

Kellogg, Emery, Inness-Brown & Cuthell, of New York City (Henry G. Hotchkiss, of New York City, of counsel), amici curiæ.

Before ROGERS, MANTON, and HAND, Circuit Judges.

ROGERS, Circuit Judge. [1] This is an appeal from an order dismissing a reclamation claim of copartners doing business as international bankers and maintaining a banking house in the city of Budapest, Hungary, under the firm name of N. Latzko & A. Popper, and on appeals in such a proceeding this court reviews both findings of fact and conclusions of law.

On June 15, 1923, an involuntary petition in bankruptcy was filed in the United States District Court for the Southern District of New York, praying that the firm of Knauth, Nachod & Kuhne be adjudged bankrupt and they are hereinafter referred to as the bankrupts. A temporary receiver was appointed and qualified, and the receivership was extended for each individual member of the copartnership, and the receiver entered into possession of the property of the alleged bankrupts.

The bankrupts were engaged in business as international bankers and maintained a banking house in the city of New York. They acted as the New York correspondents of the Budapest banking house of N. Latzko & A. Popper, the petitioners. The nature of the dealings between the two banking houses involved the transmission of funds by the Budapest house to the New York house, or the delivery by the Budapest house to the New York house of evidences of debt which were collected by the latter and placed to the credit of the former, from which account payments were made from time to time by the New York house upon order or request of the Budapest house.

There was no express agreement that evidences of debt, so forwarded to the bankrupts, were to be credited upon their receipt and before collection as a deposit of cash. Neither was there an express agreement that upon the receipt of such evidences of debt by the New York house the Budapest house should have the right to draw against the fund prior to its collection. But there was no agreement that the Budapest firm could not draw against such evidences of debt before their collection. They simply did not as a matter of fact do it. The allegations in the petition make this clear and are found in the margin. [1]

In the determination of the questions which are involved it is important to keep in mind the date on which the trustee of a bankrupt's estate becomes vested with the title to the estate. Section 70a of the Bankruptcy Act (Comp. St. § 9654) provides that "the trustee of the estate of a bankrupt, upon his appointment and qualification * * * shall in turn be vested by operation of law with the title of the bankrupt, as of the date he was adjudged a bankrupt; * * * (5) Property which prior to the filing of the petition he could by any means have transferred or which might have been levied upon and sold under judicial process against him. * * * "

And Remington on Bankruptcy (3d Ed.) vol. 3, § 1191, states that the above section of the Bankruptcy Act vests all the property in the trustee, which, prior to the filing of the petition, the bankrupt could by any means have transferred, or which might have been levied upon and sold under judicial process against him.

In Everett v. Judson, 228 U. S. 474, 479, 33 S. Ct. 568, 569 (57 L. Ed. 927, 46 L. R. A. [N. S.] 154), the court said: "We think that the purpose of the law was to fix the line of cleavage with reference to the condition of the bankrupt estate as of the time at which the petition was filed and that the property which vests in the trustee at the time of adjudication is that which the bankrupt owned at the time of the filing of the petition." And this doctrine is reasserted in White v. Stump, 266 U. S. 310, 313, 45 S. Ct. 103, 104 (69 L. Ed. 301). In the case last cited, referring to the date when the petition is filed, the court said: "The bankrupt's right to control and dispose of the estate terminates as of that time, save only as to 'property which is exempt.' "

The petition for reclamation in this case alleged that the involuntary petition in bankruptcy was filed on June 15, 1923, at 10:30 p. m., with the District Judge, and that on the same day the temporary receiver was appointed, and that on June 16th he duly qualified, filed his official bond, and entered into possession of the property of the alleged bankrupts. It then alleged that on June 16,

---

[1] "Fifth—That petitioners had no agreement with said K., N. & K. (the bankrupts) to treat evidences of debt deposited with said K., N. & K. for collection or otherwise, as a deposit of cash, nor that an immediate credit should be given by said K., N. & K. to petitioners upon the receipt of such evidences of debt.

"Sixth—That petitioners did not treat evidences of debt deposited with said K., N. & K. for collection or otherwise, as a deposit of cash, nor as an immediate credit open to petitioners by said K., N. & K. upon the receipt of any evidences of debt, nor did petitioners draw upon said K., N. & K. against the deposit or deposits of such evidence of debt before the collection of moneys due upon said evidences of debt by said K., N. & K."

1923, at 9:30 a. m., the involuntary petition in bankruptcy was duly filed in the office of the clerk of the District Court. The receiver filed an answer to the petition, in which he denied various allegations contained therein, but he did not deny the allegation that the petition in bankruptcy was filed in the clerk's office on June 16, 1923, at 9:30 a. m.

At the hearing on the reclamation petition before the special master, the attorneys for the claimant and those for the trustee for the bankrupts stipulated certain matters, and "agreed that throughout the petition the reference to 'the day said petition in bankruptcy was filed against said K., N. & K.,' or any similar allegation, shall mean only 'June 15, 1923' (this refers particularly to paragraphs eighth, ninth, tenth, eleventh, and thirteenth)."

The paragraphs thus referred to are those which contain the allegations as to the time when the three checks herein involved were delivered, credited, and collected, and that when the petitioners caused the checks to be delivered to the bankrupts for collection and deposited to the petitioners' account they did not know of the bankrupts' insolvency, and also that when they caused the checks to be delivered to the bankrupts they had a credit balance with the said bankrupts amounting to several thousand dollars, and were not then and have not been at any time since indebted to the bankrupts or to the receiver.

[2, 3] This stipulation as to the meaning of "the day said petition in bankruptcy was filed" cannot have the effect of a determination binding upon this court upon the question of the time when the petition was legally filed, so as to determine the rights of the parties as affected thereby. Neither do we understand that the parties meant anything more than that the court should understand that the allegations, in so far as they refer to the occurrence of an act on the day when the petition was filed, referred to June 15, 1923. And we hold that the petition was filed, not on June 15th, when it was presented, at 10:30 p. m., to the District Judge, but on June 16, at 9:30 a. m., when it was filed in the clerk's office.

[4] The word "filed" has not been defined by Congress. It has, however, a well-defined meaning. It signifies the delivery into the actual custody of the proper officer, designated by the statute, and whose duty it is to keep the records of the court. It carries with it the idea of permanent preservation of the thing as a public record. A paper is not

10 F.(2d)—59

filed by presenting it to the judge. He has no office in which papers are filed and permanently preserved. A paper in a case is not filed until it is deposited with the clerk of the court, for the purpose of making it a part of the records of the case. See United States v. Lombardo, 241 U. S. 73, 76, 36 S. Ct. 508, 60 L. Ed. 897; Laser Grain Co. v. United States, 250 F. 826, 831, 163 C. C. A. 140; Emmons v. Marbelite Plaster Co. (C. C.) 193 F. 181; In re Von Borcke (D. C.) 94 F. 352.

In the case under consideration the claim is based upon three checks: (1) A cashier's check of the Irving Bank-Columbia Trust Company, dated June 14, 1923, for $3,000. (2) A cashier's check of the National City Bank of New York, dated June 15, 1923, for $1,294. (3) A check of Goldman, Sachs & Co., dated June 15, 1923, drawn on the Bank of America, for $15,000. We shall consider them in the order named.

[5] *The $3,000 Check.*—This check may be found in the margin. [2] The check did not indicate on its face that it was for the account of the petitioners. But the bankrupts on June 14th, the day the check was dated, and the day on which the bankrupts received it, gave to the Irving Bank-Columbia Trust Company a receipt in which they stated the check was received "for account of N. Latzko & A. Popper, Budapest." The special master held this indicated that the bankrupts undertook to collect the check as an agent for Latzko & Popper. He held that the proceeds, when collected, would have been the property of the Budapest house, were it not for the allegation in the petition that the *petitioners caused* the Irving Bank-Columbia Trust Company, who drew the check, to deposit it for the account of the petitioners with the bankrupts. He thought, therefore, that when the check was so deposited and credited and collected, all prior to the filing of the petition in bankruptcy, the bankrupts had become debtors to the petitioners, and the proceeds of the check amounted to a debt due from the bankrupts to them.

This check was credited by the bankrupts to the claimants' account on June 14, 1923,

---

[2] "Treasurer's Check.

"New York, 6/14/23. No. K10217.
"Irving Bank-Columbia Trust Company, Woolworth Building: Pay to the order of Knauth, Nachod & Kuhne, New York City, $3,000.00, three thousand and 00/100—not over three thousand ($3,000) dollars—through New York Clearing House.
"C. W. Bugel, Treasurer.
"Countersigned: F. J. Moran."

the day before the petition in bankruptcy was presented, and on the same day that the bankrupts credited the check to the claimants' account they indorsed the check to the American Exchange National Bank, and that bank on the same day credited the bankrupts with the amount of the check. The check was collected by the American Exchange National Bank through the New York Clearing House on June 15, 1923. This was the day the petition in bankruptcy was presented to the District Judge, though prior to the filing of the petition.

The District Judge, in his opinion confirming the special master's report, states that this check was collected the day the petition in bankruptcy was filed, and then goes on to say: "The proceeds of the first check clearly became part of the assets of the bankrupts prior to the hour when the petition was filed. I can see no reason for invoking the rule that the law will take no account of the fractions of a day to defeat the bankrupts' title. It would be as tenable to hold that two lis pendens filed at different hours on the same day imposed an identical lien. The claimant cannot prevail as to the first check, and the master's report as to it should be confirmed."

[6, 7] We fully agree that there is no reason for invoking the rule that the law will take no account of the fractions of a day to defeat the bankrupts' title. It is true that for some purposes fractions of a day are not recognized in law. Louisville v. Portsmouth Savings Bank, 104 U. S. 469, 26 L. Ed. 775; McGill v. United States Bank, 12 Wheat. 511, 6 L. Ed. 711. But the rule that a day is an indivisible period of time is a mere legal fiction, which is subject to numerous exceptions; and one of them is that the courts will disregard the fiction as where it is necessary to protect a completed act or save a vested right, or to determine the conflicting rights of rival claimants when they depend upon priority in fact. Johnson v. Smith, 2 Burr. 950; Cincinnati First Nat. Bank v. Burkhardt, 100 U. S. 686, 25 L. Ed. 766; Westbrook Mfg. Co. v. Grant, 60 Me. 88, 11 Am. Rep. 181; Hoyt v. San Francisco, etc., R. Co., 87 Cal. 610, 25 P. 160, 1066; Jackson Brewing Co. v. Wagner, 117 La. 875, 42 So. 356; Johnson v. Pennington, 15 N. J. Law, 188; Brainard v. Bushnell, 11 Conn. 16; Neale v. Utz, 75 Va. 480.

But we do not agree with the District Judge, as respects this check, that it was actually paid on the morning of June 15th, and prior to the filing on the same day, but

at a later hour, of the petition in bankruptcy. That petition, for reasons already stated, was not "filed" on June 15th, when it was presented to the District Judge, but on June 16th, when it was deposited in the clerk's office. Inasmuch as prior to that time the amount of the check had been credited to the petitioners in their account with the bankrupts, and to the bankrupts in their account with the American Exchange National Bank, the amount of the check had been actually collected. The bankrupts accordingly had become debtors to the petitioners prior to the filing of the petition in bankruptcy, and the amount of the check was a part of the estate which, on June 16, 1923, passed to the receiver of the estate of the bankrupts.

But there is another reason for reaching the same conclusion. The deposit of this check with the bankrupts, who were conducting a banking business, although made by the Irving Bank-Columbia Trust Company, was made by it as the agent of the petitioners, and deposited under their instructions. It was therefore in effect as though deposited by the petitioners themselves. If it had been in fact deposited by them, to be credited in their account, and the bankrupts indorsed it and credited it in their account, the bankrupts, when so crediting it, would have made themselves at that time debtors in that amount to the petitioners, as no agreement is shown that the petitioners had no right to draw on checks deposited to their credit in their regular checking account until collection was actually made.

In Foley v. Hill, 2 Cl. & Fin. 28, in the House of Lords, the effect of a deposit in a bank was fully discussed by Lords Cottenham, Brougham, and Lyndhurst. They concurred in the opinion that the relation between a banker and customer, who pays money into a bank, or to whose credit money is placed there, is the ordinary relation of debtor and creditor. And in Bank of the Republic v. Millard, 10 Wall. 152, 155 (19 L. Ed. 897), the Supreme Court, in 1869, declared:

"It is no longer an open question in this court, since the decision in the cases of Marine Bank v. Fulton Bank, 2 Wall. 252 [17 L. Ed. 785], and of Thompson v. Riggs, 5 Wall. 663 [18 L. Ed. 704], that the relation of banker and customer, in their pecuniary dealings, is that of debtor and creditor."

In St. Louis & S. F. Ry. Co. v. Johnston, 27 F. 243, A., who had an account in B. Bank in New York, deposited in the bank a sight draft drawn by him on a corporation in Bos-

ton. The bank credited him with the amount of the draft as a cash deposit. The bank was insolvent at the time, but it forwarded the draft to its collection agent at Boston and it was paid after the bank had failed and closed its doors. Judge Wallace, sitting in the Circuit Court for the Southern District of New York, held that the draft was not the property of A. when paid by the drawee, and that he was not entitled to recover the amount thereof from the receiver. He said:

"When a sight bill is deposited with a bank by a customer at the same time with money or currency, and a credit is given him by the bank for the paper, just as a like credit is given for the rest of the deposit, the act evinces unequivocally the intention of the bank to treat the bill and the money or currency, without discrimination, as a deposit of cash, and to assume towards the depositor the relation of a debtor, instead of a bailee of the paper."

In Burton v. United States, 196 U. S. 283, 25 S. Ct. 243, 49 L. Ed. 482, certain checks on a bank in St. Louis were sent from that city to the payee, in Washington. The payee, on receiving them, indorsed them and deposited them in a bank in Washington, and they were immediately credited in the payee's account. The checks were afterwards paid in due course by the St. Louis bank. The court held that the Washington bank acquired the title to the checks when the deposit was made and credited in the depositor's account. The court said:

"There was no oral or special agreement made between the defendant and the bank at the time when any one of the checks was deposited and credit given for the amount thereof. The defendant had an account with the bank, took each check when it arrived, went to the bank, indorsed the check which was payable to his order, and the bank took the check, placed the amount thereof to the credit of the defendant's account, and nothing further was said in regard to the matter. In other words, it was the ordinary case of the transfer or sale of the check by the defendant and the purchase of it by the bank, and upon its delivery to the bank, under the circumstances stated, the title to the check passed to the bank and it became the owner thereof. It was in no sense the agent of the defendant for the purpose of collecting the amount of the check from the trust company upon which it was drawn. From the time of the delivery of the check by the defendant to the bank it became the owner of the check; it could have torn it up or thrown it in the fire or made any other use or disposition of it which it chose, and no right of defendant would have been infringed. The testimony of Mr. Brice, the cashier of the Riggs National Bank, as to the custom of the bank when a check was not paid, of charging it up against the depositor's account, did not in the least vary the legal effect of the transaction; it was simply a method pursued by the bank of exacting payment from the indorser of the check, and nothing more. There was nothing whatever in the evidence showing any agreement or understanding as to the effect of the transaction between the parties—the defendant and the bank—making it other than such as the law would imply from the facts already stated. The forwarding of the check 'for collection,' as stated by Mr. Brice, was not a collection for defendant by the bank as his agent. It was sent forward to be paid, and the Riggs Bank [the bank of deposit] was its owner when sent."

The trial judge in the Burton Case had instructed that the effect of the deposit of the checks in the Washington bank depended upon the understanding and intent of the bank and the depositor; that if the intent and understanding was that the bank should become the purchaser of the check and be the absolute owner thereof, then the payment to the Washington bank amounted in law to a payment to that bank and not to the depositor; but if the intent and understanding of the bank and the depositor was that the Washington bank should act as the agent of the depositor, then the payment in St. Louis was in law a payment to the depositor. The Supreme Court held this was error, and that there was no foundation for submitting to the jury the question as to what the understanding of the parties was at the time the deposit was made; and this it held because the uncontradicted evidence showed that there was no agreement or understanding of any kind, other than such as the law made from the transaction detailed.

[8] This court, in Re Ruskay, 5 F.(2d) 143, 149, stated that where a check or draft is indorsed and deposited in a bank, and is accepted as cash, it at once becomes the property of the bank, and the bank becomes the debtor of the depositor in the amount of the check so deposited, with the superadded obligation that the money is to be paid when demanded by check. In the absence of special agreement to the contrary, or some notice to the contrary given to the depositor prior to

or at the time of the deposit, such is the rule as to the effect of the transaction.

The New York Court of Appeals in Cragie v. Hadley, 99 N. Y. 133, 1 N. E. 537, 52 Am. Rep. 9, laid down the law as follows:

"The general doctrine that upon a deposit being made by a customer, in a bank, in the ordinary course of business, of money, or of drafts or checks received and credited as money, the title to the money, or to the drafts or checks, is immediately vested in and becomes the property of the bank, is not open to question. * * * The transaction, in legal effect is a transfer of the money, or drafts, or checks, as the case may be, by the customer to the bank, upon an implied contract on the part of the latter to repay the amount of the deposit upon the checks of the depositor. The bank acquires title to the money, drafts, or checks, on an implied agreement to pay an equivalent consideration when called upon by the depositor in the usual course of business."

[9] The general rule is undoubted that checks deposited in a bank for collection remain the property of the depositor. Clark Sparks & Sons Mule, etc., Co. v. Americus National Bank, 230 F. 738; Richardson v. New Orleans Coffee Co., 102 F. 785, 42 C. C. A. 619, 52 L. R. A. 67; Philadelphia v. Eckels (C. C.) 98 F. 485; Fifth National Bank v. Armstrong (C. C.) 40 F. 46; Blair v. Hill, 165 N. Y. 672, 59 N. E. 1119; Perth Amboy Gas Light Co. v. Middlesex County Bank, 60 N. J. Eq. 84, 45 A. 704; South Park Fidelity, etc., Co. v. Chicago Great Western R. Co., 75 Minn. 186, 77 N. W. 796.

In 7 C. J. 599, the law is stated as follows:

"One depositing paper in a bank may part with his title at the time of such deposit by a special agreement *or by an indorsement in blank;* and the general rule is that where such paper is indorsed in blank, the first bank, or any other bank through which it may pass, indorsed in the same manner, acquires a legal title. * * * *"

It is our opinion that, when the bankrupts received this check payable to their order without restriction and credited it in the petitioners' checking account, the relation of debtor and creditor was thereby established on June 14, 1923. If not established then, there can be no question but that it was established on June 15th, when the check was collected. And as the petition in bankruptcy was not filed until June 16th, there can be no doubt that the receiver in

bankruptcy, and not the petitioners, was entitled to the proceeds of the $3,000 check.

[10] *The $1,294 Check.*—This check may be found in the margin. [3] The petitioners alleged in their petition that on June 15, 1923, they caused the National City Bank of New York to deliver to the bankrupts this check, to be collected for the account of the petitioners, and that it was to be so collected appears on the face of the check itself; for the words, "favor N. Latzko & A. Popper, Budapest," seem to us, on the whole, not to differ in effect from "collect for N. Latzko & A. Popper, Budapest." A check so drawn cannot be said to be freely negotiable. Any payee to whom it was indorsed would take the proceeds, when collected, not for himself, but for N. Latzko & A. Popper.

The bankrupts received the check on June 15, and on the same day they indorsed it in the manner disclosed in the margin.[4] An examination of the check and the indorsement thereon disclosed to the American Exchange National Bank that it did not thereby acquire title to the check, and that the proceeds did not belong to it or to the indorsers, but to N. Latzko & A. Popper. The nature of the transaction was not affected by the fact that the bankrupts, when they received the check, credited it on June 15, in the account of the petitioners, or that the subsequent indorsee, the American Exchange National Bank, when they received the check on June 15, at once credited it in the account of the bankrupts. The bank did not receive the proceeds until June 16, and, when they received it, it was not as their money, and not as the money of the bankrupts, but as the money of N. Latzko & A. Popper, the petitioners herein. The right of the petitioners to the proceeds of the check is not to be defeated by the fact that the bankrupts credited it in the petitioners' account before it was collected, or by the fact that the American Exchange Bank credited it in the indorsers' account. They might do

---

[3] "No. F. T. 261365.  New York, June 15, 1923.

"Cashier's Check.

"The National City Bank of New York: Pay to the order of Knauth, Nachod & Kuhne, New York, $1,294.00, favor N. Latzko & A. Popper, Budapest, one thousand two hundred ninety-four and 00/100 dollars. Payable only through New York Clearing House.

"N. G. Lenfestey, Cashier.
"J. W. Allale, Asst. Cashier."

[4] "Pay to American Exchange National Bank, or order.  June 15, 1923.

"Knauth, Nachod & Kuhne,
"New York, N. Y.
"1-548.                                1-548".

so at their own risk, but not at the risk of the petitioners. The proceeds of the check, whenever it was collected, belonged to N. Latzko & A. Popper; and nothing the bankrupts could do prior to its collection could deprive them of their right to the fund.

In 1860, in Lee v. Chillicothe Branch of State Bank, 15 Fed. Cas. 151, No. 8,187, Mr. Justice McLean (of the Supreme Court), sitting as Circuit Justice, had before him bills drawn by certain persons at Chillicothe, Ohio, on Edwin Ludlow of New York, as cashier of the Ohio Life Insurance & Trust Company, payable to the order of the defendant, indorsed: "Credit my account. James B. Scott, Cashier." The indorsement was held to be restrictive, and put an end to the negotiability of the bill. It was an appropriation of the proceeds of the note, which rendered any other appropriation of them illegal. It was said that, if a bill be restrictively indorsed, a subsequent indorsee takes it upon the same trust that was devolved upon the first indorsee. "He is a mere agent and trustee for his principal, and whoever takes the money holds it under a similar trust."

In Bank of the Metropolis v. First National Bank of Jersey City, 19 F. 301, in the Circuit Court for the Southern District of New York, the plaintiff sent the checks to the Mechanics' National Bank of Newark, for collection, with the qualified indorsement: "For collection, pay to the order of O. L. Baldwin, Cashier." The Newark Bank sent the checks for collection to the defendant. After the defendant received the checks, the Newark Bank became insolvent. Judge Wallace held that the indorsement by plaintiff "for collection" was notice to all parties subsequently dealing with the checks that the plaintiff did not intend to transfer the title of the paper or the ownership of the proceeds to another. He said: "As was held in Cecil Bank v. Bank of Maryland, 22 Md. 148, the legal import and effect of such indorsement was to notify the defendant that the plaintiff was the owner of the checks, and that the Newark Bank was merely its agent for collection."

In re Jarmulowsky, 249 F. 319, 161 C. C. A. 327, L. R. A. 1918E, 634, a depositor indorsed checks in blank and received credit for the same in his passbook. The book contained a notice that "deposits of checks shall not be drawn against until collected." These checks were redeposited to their own account in other banks and were in due time collected, but collection had not been made when the receiver in bankruptcy took possession of the banking house in which the original deposits were made. This court held that, in the absence of the special agreement between the depositor and the bank, the title to the checks would have passed to the bank, and the bank would have become merely a debtor to the depositor for the amount entered in the passbook. The question presented was whether a depositor, who is credited with the face of checks, which he has agreed not to draw against until they shall have been collected, has by the act of deposit parted with the title to the checks so deposited. Under the circumstances stated this court thought that the course of business shown created the relation of principal and agent and was in effect the same as though the checks had been indorsed, "For collection and deposit to the account of the depositors." The court pointed out that if, prior to the bankruptcy proceeding, the agency had been fulfilled by collection of the checks, the moment the bank got the money on the checks the relation of debtor and creditor would have arisen.

In White v. Miners' National Bank, 102 U. S. 658, 26 L. Ed. 250, a draft was indorsed, "Pay to A. or order for account of B." The court held that by the terms of the indorsement A. became merely the agent of B. for the collection of the money. The plaintiff relied on two propositions. The first of these is that words are merely directory and capable of explanation, and when it is shown by parol testimony, as in this case, that the plaintiff bought and paid full value for the draft, with the understanding that he was buying it as commercial paper, with the usual incidents of such a transaction, the indorser is liable in the usual manner, notwithstanding the words we have quoted. The other proposition is that such is the custom of bankers who deal in such paper in New York, where these drafts are payable, and that the custom must control the construction of the contract. Mr. Justice Miller, writing for the court, after stating the two propositions on which the plaintiff relied, said:

"We are not satisfied that either of these propositions is sound. The language of the indorsement is without ambiguity, and needs no explanation, either by parol proof or by resort to usage. The plain meaning of it is that the acceptor of the draft is to pay it to the indorsee for the use of the indorser. The indorsee is to receive it on account of the indorser. It does not purport to transfer the title of the paper or the ownership of

the money when received. Both these remain, by the reasonable and almost necessary meaning of the language, in the indorser. It seems to us that the court below correctly construed the effect of the indorsement to be to make White the agent of the bank for the collection of the money. If this be a sound view of the legal effect of the written indorsement, neither parol proof nor custom can be received to contradict it. But we are aware of the necessity of proceeding with great caution in a case of first impression in regard to questions affecting commercial transactions, and we do not, therefore, decide this one, because we do not think it absolutely necessary to the case; for, assuming this to be correct, we think the plaintiff was still entitled to recover more than he did."

The legal effect of the transaction was merely to enable White to collect the money for the bank, and it was held that where A., the payee of a check, indorses it to B. "for account of A.," B. does not get title to the check, but is merely the agent to collect it for A.'s benefit. It is our understanding that if A. deposits a check in a bank in which he has a checking account, and indorses it for his account, and the bank credits it to his account, the title to the check passes to the bank, and it becomes a debtor to the depositor for the amount thereof.

At the argument emphasis was placed upon the allegation made by petitioners in their petition that they caused this check to be delivered by the National City Bank to the bankrupts, and we were told that the effect of the transaction must therefore be the same as though this check had been brought in by the petitioners, and that if the petitioners had brought it in, and the bankrupts had at once placed it to the credit of the petitioners, the relation of debtor and creditor would then and there have been established between them. It may be true that if petitioners had presented the check for collection, and it was agreed between them and the bankrupts that it was to be credited before collection, such would have been the effect of the transaction. But there was no such agreement made between them or on their behalf.

It is our opinion that the words on this check, "Favor N. Latzko & A. Popper, Budapest," restricted the payee's power over the check. The words were equivalent to an indorsement for collection. A check made payable to a payee in favor of another is not freely negotiable, and the payee holds it as an agent until he has collected and credited it. As this check was not collected until June 16, 1923, "during banking hours," we think the money collected on the check was the property of the petitioners at the time the petition in bankruptcy was filed on the morning of that day at 9:30 a. m., and therefore did not pass to the receiver in bankruptcy.

[11] *The $15,000 Check.*—This check may be found in the margin.[5]

The petitioners alleged in their petition that on June 15, 1923, they caused Goldman, Sachs & Co. to deliver to the bankrupts this check, "to be collected" by the latter for the account of the petitioners. This allegation was in terms similar to that made respecting the $1,274 check above considered. But the check which was introduced in evidence differs from that check, in that it does not disclose that it was to be collected for the petitioners. At the time this check was delivered to the bankrupts, they accompanied it with a letter explaining that it was for account of petitioners. The letter is in the margin. [6]

On receipt of the check, on June 15th, the day prior to the filing of the petition in bankruptcy, the bankrupts credited it to the account of the petitioners. They on the same day indorsed the check, "Pay to American Exchange National Bank or order," and delivered it to that bank; and that bank also on the same day credited the bankrupts with the amount of the check in the bankrupts' account. But the check was not actually collected until the following day "during banking hours." The petitioners state in their petition that this collection was made after the petition in bankruptcy was filed, but as they also allege that the petition was filed on June 15, and the facts show that it was not filed until June 16, we do not know whether collection was actually made before or after the filing of the petition; and in the

---

5 "Goldman, Sachs & Co.

"No. 69619.            New York, Jun. 15, 1923.

"The Bank of America: Pay to the order of Knauth, Nachod & Kuhne, $15,000, fifteen thousand dollars.

"Passed.

"FNY                        J. M. Humphrey."

6 "New York, June 15, 1923.

"Knauth, Nachod & Kuhne, New York: We hand you herewith our check for fifteen thousand dollars for account of Latzkopper, Budapest, by order of Julius Baer & Co., Zurich, as per cable, June 15, from same.

"Please sign the attached receipt and return to bearer.

"$15,000.            Goldman, Sachs & Co."

view we take of the matter it is unimportant whether collection was made on June 16 prior to the hour when the petition in bankruptcy was filed or on a later hour on the same day.

The important fact is that this $15,000 check is on its face a straight unrestricted cashier's check, payable to the order of the bankrupts. The petitioners state they caused Goldman, Sachs & Co., as their agents, to deliver it. The letter which Goldman, Sachs & Co. sent with the draft simply amounted to an explanation, to the persons to whose order it was drawn, that it was to be placed in the account of the petitioners. This they did as the agents of the petitioners. The legal effect of the transaction was the same as though the petitioners had themselves deposited the check "for our account" with the bankrupts on June 15 and the latter had at once credited it to the petitioners, and then on the same day transferred the title to the check to the American Exchange National Bank, which on the same day credited it in the bankrupts' account. That transaction made the American Exchange National Bank the owner of the check on June 15, and the proceeds when collected on June 16 belonged, not to the petitioners, or to the bankrupts, but to the bank, which was the owner of the check when it was collected. We think the transaction is governed by the rule laid down in the Burton Case, and that the relation between the petitioners and the bankrupts on June 15, when this check was credited by the latter to the former, was that of creditor and debtor, and that the proceeds of this check, when it was collected on June 16, did not belong to these petitioners. The finding of the court below, as to this check, was not erroneous. The authorities cited in what we have said respecting the check for $3,000 are equally applicable to this check for $15,000.

[12] Before concluding this opinion, we may remark that, while the petitioners alleged in their petition that at the time the bankrupts accepted the checks and deposited them they knew full well that they were insolvent and unable to meet their obligations, and that they knew of the preparation of the original involuntary petition in bankruptcy filed against them, it was also alleged that at the time the checks were delivered to them the bankrupts wrongfully, fraudulently, and with intent to defraud the petitioners held themselves out as a solvent and solid banking house, whereas they were insolvent and unable to pay their debts. The answer interposed by the trustee denied any knowledge or information sufficient to form a belief as to the allegation. This was not an admission of the truth of the petitioners' allegation, and was sufficient to put the petitioners to their proof. 1 Encyc. of Pl. & Pr. 947; Federal Equity Practice, vol. 1, § 726.

[13,14] If the bankrupts knew they were hopelessly insolvent and could not go on when they received the checks, and credited the same in the accounts of the petitioners, they acted fraudulently in doing what they did, and the petitioners would be entitled to rescind the transactions involved, and the bankrupts would hold as trustees ex maleficio subject to the petitioners' right of reclamation. St. Louis & San Francisco Railway Co. v. Johnston, 133 U. S. 566, 10 S. Ct. 390, 33 L. Ed. 683. The mere fact of insolvency is not enough. The insolvency must be of such a character that it was manifestly impossible for the bankers to continue in business and meet their obligations, and that fact must have been known to them when they accepted the deposits. Fidelity & Deposit Co. v. Kelso State Bank, 287 F. 828, 830; Quin v. Earle (C. C.) 95 F. 728.

[15] But the burden was on the petitioners to show these facts, and this they have not done. The record does not disclose that any evidence was introduced before the special master in support of the allegations that the bankrupts knew they were insolvent and could not go on when they received the checks and credited them in the petitioners' account.

The decree is affirmed as to the checks for $3,000 and $15,000, and is reversed as to the check for. $1,294.